The **PRUDENTIAL INSURANCE COM-PANY OF AMERICA**, Appellee,

v.

Frances S. **BARDEN**, Appellant.

No. 13417.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 3, 1970.

Decided April 13, 1970.

Winter, Circuit Judge, dissented.

Henry C. Bourne, Tarboro, N. C., for appellant.

Robert L. Emanuel, Raleigh, N. C., for appellee.

Before BRYAN, WINTER and CRAVEN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

Two policies issued by The Prudential Insurance Company of America on October 1, 1966 in North Carolina upon the life of Frank Barden were rescinded at the insurer's suit after his death on December 28, 1966. Both the suit, and the decision of the District Court sustaining it, were grounded upon the assertion of falsity in material representations in the application for the insurance. The beneficiary of the contracts—Frances S. Barden, the widow—appeals. We reverse because of the failure in proof of misrepresentations and also because of the waiver of the asserted misrepresentations.

Subsistence of the policies—each for $10,000.00—at death was not questioned. Judgment went upon the company's sum-

mary motion, but no point is made of this procedure since the evidential facts are not in controversy. Frank Barden, 48 years old and an accountant by profession, applied on September 29, 1966 for the insurance under a group type plan of the American Institute of CPAs. His written application avowed the completeness and truth of its contents.

The trial court concluded that "in fact and in law the answers to questions 12 and 13 * * * were clearly false, with no waiver or estoppel on the part of the plaintiff [the company]; that said answers were material as a matter of law; * * *" Verbatim, the text and context of the relevant portions of the application follow:

10. Has the Person Proposed for Insurance ever been treated for or had any indication of:

| | Yes | No | | | Yes | No |
|---|---|---|---|---|---|---|
| (a) Heart Trouble? | ☐ | ☒ | (f) Spine or Back Disorder? | | ☐ | ☒ |
| (b) High Blood Pressure? | ☐ | ☒ | | | | |
| (c) Lung Trouble? | ☐ | ☒ | (g) Nervous Disorder? | | ☐ | ☒ |
| (d) Stomach or Intestinal Trouble? | ☒ | ☐ | (h) Diabetes or Sugar in Urine? | | ☐ | ☒ |
| (e) Kidney or Bladder Trouble? | ☐ | ☒ | (i) Cancer? | | ☐ | ☒ |
| | | | (j) Tumors? | | ☐ | ☒ |

11. Has the Person Proposed for Insurance within the past 5 years:

| | Yes | No |
|---|---|---|
| (a) Had or been advised to have a surgical operation? | ☒ | ☐ |
| (b) Been a patient in or advised to enter a hospital or sanatorium? | ☒ | ☐ |
| (c) Consulted, been attended or examined by a doctor or other practitioner? | ☒ | ☐ |

| 12. Has the Person Proposed for Insurance any physical deformities, impairments or ill health not recorded in answer to Question 10 or 11? | Yes ☐ | No ☒ |
|---|---|---|

13. What are the complete details of all "Yes" answers to Questions 10, 11 and 12?

| Question No. | Condition, Details and Number of Attacks (if operated, so state) | Duration of Disability | Complete Recovery Month | Year | Names and Addresses of Physicians and Hospitals |
|---|---|---|---|---|---|
| 10(d) [A1596] | Appendicitis Operation | 5 days | May | 1964 | Dr. O.E. Bell Memorial Hospital Rocky Mount, N.C. |

---

*Question No. 12*, whose answer the company impugns as a misrepresentation, asks for a listing of "deformities, impairments or ill health not recorded" in the responses to the dozen searching inquiries of questions 10 and 11. Notably, No. 12 speaks in the present tense and the applicant's negative response likewise speaks as of the time of the application, that is September 29, 1966. There was adequate basis for his answer. On January 17, 1966 he sought a "general check-up" by Dr. K. D. Weeks because of "excessive fatigue over a period of one or two years." He returned for "thirty-day check-ups", and the physician described his condition as of May 23, 1966 as follows:

"Reported doing well and feeling fine. Apparently has not indulged in

alcoholic drink and has taken good care of himself, resting completely except for his essential gainful occupation. ROS not remarkable. *Has no specific complaint.* The abdomen is slightly rounded but there is no evidence of enlargement of the liver, no tenderness and no evidence of free fluid. Heart and lungs are clear. His facial appearance is still that of an alcoholic but less marked." (Accent added.)

In a routine four-months reexamination, the same physician summarized the patient's condition as of August 23, 1966, just a few days more than a month before the application, in this way:

"(4) August 23, 1966.

"Has continued to do remarkably well and *at this time has no complaints.* He has followed his routine quite well but admits that he occasionally takes a beer or two and an occasional drink of whiskey. His facial appearance has improved, he no longer complains of nausea or fatigue and his ROS is not remarkable. He has had no abdominal complaints, appetite, digestion and bowel functions have been good. He has continued to lose a little weight and has remained on his diet as prescribed. *Re-examination otherwise is not remarkable.* There is no palpable enlargement of his liver, there is no evidence of abdominal ascites or other palpable organs or masses. *Heart action good, lungs clear.* Mouth and tongue negative. Fasting blood sugar and cholesterol are comparatively satisfactory and the latter has again improved.

"Impression: Condition shows progressive improvement with no current clinical evidence of active liver damage." (Accent added.)

These periodic reports were certainly sufficient to justify a lay patient to believe that a few weeks later, without an intervening sickness, he could say in good faith that he was not then suffering from "any physical deformities, impairments or ill health not recorded" in the catechism of 10 and 11.

Incompleteness in the answer to question 13—apparently suggesting that it did not tell the *whole* truth—was the basis for branding its answers as misrepresentations. It comprises an omnibus inquisition for details of the "yes" answers to 10, 11 and 12. Reiteration of No. 12's integrity will not be undertaken in connection with 13, for its bona fides has been demonstrated.

Deficiency is first leveled at 13 for its singleness of answer. The response adverts solely to 10(d) and details merely an appendectomy two years previous. Seemingly, the company contends that the applicant should have catalogued all indispositions suffered in the five year period before September 29, 1966. According to the company's brief, with their chronology and nature, they would have been the following:

1. *July 28, 1963* after admission to *Memorial Hospital* in Rocky Mount, North Carolina upon direction of *Dr. Bell*, examinations disclosed slight cardiospasm and plyorospasm, with duodenal irritability and slowly emptying stomach. On the next day X-rays taken in *same hospital.*

2. *May 5, 1964* successful appendectomy—*same hospital.*

3. *May 12, 1964* released from hospital.

4. *February 9, 1965* admitted to *same hospital* on complaint of nausea and vomiting of blood, and given injection of glucose.

5. *February 10–11, 1965* received two injections of whole blood and more glucose at *same hospital.*

6. *February 18, 1965* released from hospital after determination that vomitus came from ruptured blood vessel in stomach or esophagus.

7. *January 17, 1966 Dr. Weeks*, on complaint of excessive fatigue over one or two years, and after relating history of February 1965 hospitalization, diagnosed condition as

(a) Alcoholic habituation, border-line

(b) Fatigue symptoms associated with "Dx#1"

(c) History of esophegal varices, secondary to cirrhosis or liver disease in February 1965

(d) Hypercholesterolemic

(e) Hypothyroid

(f) Epidermophytosis of feet

Patient was informed of diagnosis and urged to stop permanently all alcoholic indulgence because of liver trouble, and put on low cholesterol diet.

8. *April 15, 1965*—with *Dr. Weeks* in attendance, admitted to sanitarium, also in Rocky Mount, for weakness, abdominal pain, nausea and frequent regurgitation of food—diagnosis of acute hepatitus stage of cirrhosis of liver.

9. *April 21, 1966*—released with diagnosis of cirrhosis of liver and with instructions of physical rest and total alcoholic abstinence.

10. *May 23, 1966*—reexamination by *Dr. Weeks* who found facial appearance of an alcoholic but less marked and improved appearance—repetition of instructions.

11. *August 23, 1966*—routine 4-month follow-up examination discovered resumption of some beer and an occasional drink of whiskey—observed progressive liver improvement.

12. *December 28, 1966*—admitted to same sanitarium in Rocky Mount, for nausea, vomiting, drenching sweat —died from acute pancreatitis.

This, we think, was expecting too much of the applicant. Omission of the tabulation cannot be considered a withholding of information sufficient to constitute misrepresentation.

■ Question 13, in its inclusion of No. 10, asks about previous treatment for, or indication of, *specified* physical trouble or disorders of the applicant. Appendectomy was noted because of No. 10(d)'s inquiry on whether the applicant had been "treated" for or had any indica-tion of "stomach or intestinal trouble". The surgery was certainly in this category. As tied into 13, No. 10 did not allude to any liver involvement, something with which the applicant had suffered. Thus question 10 in this context was meetly answered.

Question 11, as embraced in 13, is not directed to a particular disease or parts of the anatomy. Rather, it is a multiple quizzing designed to elicit information regarding *any* medical attention whatsoever which Frank Barden may have received "within the past five years". His reply to each part was positive, that is: (a) "yes" he had had or been advised to have a surgical operation, (b) "yes" he had been a patient in or advised to enter a hospital or sanatorium, and (c) "yes" he had consulted, been attended or examined by a doctor or other practitioner. This question was as broad as phraseology would permit and was fully rejoined.

Each of these rejoinders could well have been referable to the appendectomy. Likewise they could have related to the medical attention he received for liver troubles or to any of the possible maladies not appearing in question 10. No deception or half-truth is proved here.

■■ To summarize, the company's accusations of falsity were in no instance sustained. The burden was upon the company to prove that the answers to questions 12 and 13 were false. Old Colony Ins. Co. v. Garvey, 253 F.2d 299, 301 (4 Cir. 1958).

■ No. 13 afforded the insurer abundant means of discovery of complete medical history in respect to the "Stomach or Intestinal Trouble" asked in 10 (d). The insurer needed but to interview the surgeon and look at the hospital records. Almost his every examination and treatment were in the same hospital. In these circumstances the law of North Carolina, controlling in this diversity case, will not permit a defense of incompleteness to defeat the policy. The company already had the equivalent of the details it was dredging for in No. 13, for as was recognized in Gouldin v. Inter-

Ocean Ins. Co., 248 N.C. 161, 102 S.E.2d 846, 849 (1958):

> " 'Knowledge of facts which the insurer has or should have had constitutes notice of whatever an inquiry would have disclosed and is binding on the insurer. The rule applies to insurance companies that whatever puts a person on inquiry amounts in law to "notice" of such facts as an inquiry pursued with ordinary diligence and understanding would have disclosed.' 16 Appleman, Insurance Law and Practice, p. 817."

■■ Indeed, if any of the answers appeared to be so scanty as to suggest concealment, the insurer waived the defect. When the company accepted the application, it was perfectly plain that all of the questions had not been answered as fully as the company thought requisite. Nevertheless, the policy was granted. By issuing the policy without requiring a more expanded answer the company "waived answer to the inquiry and elected to treat it as immaterial." Bowles v. Mutual Ben. Health & Accident Ass'n, 99 F.2d 44, 46 (4 Cir. 1938). Waiver is also presumed when the insurer, as it did here, waited for several months to raise the objection. Id. at 50.

It is best summed up in Phoenix Mutual Life Ins. Co. v. Raddin, 120 U.S. 183, 190, 7 S.Ct. 500, 502, 30 L.Ed. 644 (1887), it is said:

> "But where upon the face of the application a question appears to be not answered at all, or to be imperfectly answered, and the insurers issue a policy without further inquiry, they waive the want or imperfection in the answer, and render the omission to answer more fully immaterial. * * * "

Nothing we have said trespasses upon our holding in Sivertsen v. The Guardian Life Ins. Co., 423 F.2d 443 (4 Cir., No. 13,282, 1970), for the facts are markedly apart in the two. Here there was no effort to withhold information. Where the answers may not be precise, they are not shown to be knowledgeably so to the applicant.

The judgment on appeal must be vacated, and the action remanded with directions for entry of judgment in favor of the appellant.

Vacated and final judgment ordered.

WINTER, Circuit Judge (dissenting).

I find no failure of proof of misrepresentation. Nor do I think that the artfully practiced fraud was waived by the insurer. I dissent from the majority's contrary conclusions; I would affirm the district judge.

In response to questions patently designed to elicit his history of acute pancreatitis and cirrhosis of the liver from excessive use of alcohol, the insured admitted only to hospitalization and treatment for an unexceptional appendicitis. Specifically, the insured replied affirmatively to question 10(d) that he had had or had been treated for "stomach or intestinal trouble" and affirmatively to questions 11(a), (b) and (c) that he had been advised to have a surgical operation, that he had been a patient in a hospital or sanitarium and that he had been consulted or attended by a doctor or other practitioner. He denied, by his negative answer to question 12, that he had any physical deformities, impairments or ill health, other than those disclosed in his answers to questions 10(d) and 11(a)–(c), and when asked by question 13 for the *complete details* of all affirmative answers to the previous questions, he responded, carefully limiting his answer solely to his affirmative reply to question 10(d), that he had undergone an appendicitis operation in 1964 by Dr. O. E. Bell, at Memorial Hospital, Rocky Mount, North Carolina, that he was a hospital patient for five days and that his recovery was complete.

The fact of the matter is that the insured was suffering from a variety of serious illnesses. He had been diagnosed as having cirrhosis of the liver, acute alcoholism, gall bladder impairment and pancreatitis. He knew of these diagnoses. He had been advised to pursue a course of total and permanent alcoholic abstinence. He knew that he had not followed this

advice completely. Significantly, the diagnosis of these ills was made by Dr. K. D. Weeks, after the insured had ceased being a patient of Dr. Bell, and his hospitalization, during which his symptoms were diagnosed, occurred at a hospital other than the hospital where his appendix was removed.

Since the only ill health disclosed by the insured was "stomach or intestinal trouble" in his answer to question 10(d), the conclusion is inescapable that the insured's negative response to question 12 which sought to elicit physical impairments or ill health not previously recorded was patently false. The majority's finding that the insured, as a "lay patient" could have good faith belief that he was not ill, is simply unsupported by the record, even when his possible belief is considered as of the date of his insurance application.

Nine months before his insurance application the insured consulted Dr. Weeks. He was told that he had liver disease and other ailments, that his past history of hemorrhage was a result of the liver disease and that he was a borderline alcoholic habituate. He was strongly urged to stop permanently all alcohol indulgence and placed on a restricted diet.

Two months later, because of aggravated symptoms, the insured was placed in the hospital, where he remained for six days. At this time he and his wife were told that he suffered from cirrhosis of the liver. He was placed on a diet, told to take vitamins daily, and his physical activities were restricted. Total and permanent alcoholic abstinence was prescribed and he was directed to return for further medical evaluation in thirty days.

At the thirty-day checkup, the insured was permitted to increase his physical activity moderately, but the diet (this time with a maximum body weight prescribed), daily vitamins and total and permanent alcoholic abstinence were continued. The insured was directed to return in four months.

At the four-month checkup, which occurred a month before the application, the insured was found to be improved. He admitted that he had not pursued a course of total alcoholic abstinence, but he was told that he was better. Nonetheless, the diet, the vitamins, the restricted physical activity, the weight limitation and the total and permanent alcoholic abstinence were continued and he was told to return in six months.

Thus, a month before his insurance application, the insured knew that he had been repeatedly told that he had cirrhosis of the liver and other ailments, and further knew that he was under continuing medical supervision and medication, that his diet, weight and physical activities were restricted and that his intake of alcohol was absolutely prohibited. This is hardly a picture from which the insured could reasonably conclude that he was not suffering from "any * * * ill health." I cannot conclude that the insured was an unintelligent or uninformed person. He was a certified public accountant and a member of at least two professional accounting societies of national stature. *Cf.* Equitable Life Assur. Soc. of United States v. Ashby, 215 N.C. 280, 1 S.E.2d 830, 833 (1939).

In addition to the demonstrably false answer to question 12, the insured purposefully withheld information in replying to question 13 by reason of his failure to disclose the diagnosis and treatment of Dr. Weeks and the hospitalization while he was a patient of Dr. Weeks. Even if on the day of the insurance application he considered himself in good health, this suppression of vital information cannot be explained away.

I would conclude that in two respects, i. e., the negative answer to question 12 and the suppression of a full answer to question 13, the insured practiced misrepresentations on the insurer. Under the North Carolina law which governs, the district judge had a dual basis for relieving the insurer of liability under the policies, because written answers relating to health in insurance applications are deemed material as a matter of law and a misrepresentation or omission therein will avoid the policy. Sims v.

Charlotte Liberty Mutual Insurance Co., 257 N.C. 32, 125 S.E.2d 326 (1962); Rhinehardt v. North Carolina Mutual Life Ins. Co., 254 N.C. 671, 119 S.E.2d 614 (1961); Tolbert v. Mutual Benefit Life Ins. Co., 236 N.C. 416, 72 S.E.2d 915 (1952); Shenandoah Life Insurance Co. v. Hawes, 256 F.Supp. 366 (E.D.N.C. 1966).

The North Carolina rule is, of course, subject to the qualification that the insurer may waive its defense of the insured's ·misrepresentations. Jones v. Home Security Life Insurance Company, 254 N.C. 407, 119 S.E.2d 215 (1961). The majority finds waiver from the insurer's failure to make further inquiries concerning the information which was disclosed. It charges the insurer, as a matter of law, with knowledge of the true facts notwithstanding the insured's misrepresentations and suppressions. How this can be so, I fail to comprehend.

First, the insured's limiting reference to his affirmative answer to question 10 (d) in his response to question 13 would appear unexceptional, since the data that he disclosed in answer to question 13 would appear to be a full and complete detailing of his affirmative answers to the several parts of question 11. Particularly is this so because question 12 was answered negatively. And because answered negatively, no detailing of question 12 in question 13 was required. Moreover, the insured certified at the end of his application that his "statements and answers to the above questions are complete and true." Further inquiry from the insured would have appeared to be both unnecessary and futile.

But even if the insurer had made inquiry of Dr. Bell or of Memorial Hospital, the record does not warrant the majority's conclusion that the insurer would have uncovered the significant information withheld from it. Despite the majority's contrary assertion, the insured's "almost every" examination and treatment were *not* in the same hospital. Nor were they by the same doctor.

The insured consulted Dr. Bell for his appendicitis and the surgical proce-dure was performed at Memorial Hospital, Rocky Mount, North Carolina. It is true that the insured had been hospitalized at Memorial Hospital both before and after the appendectomy. The last hospitalization there was in February, 1965, as a result of his having experienced a hemorrhage from a ruptured blood vessel in his stomach or esophagus. Apparently on both occasions some gall bladder difficulty was suspected, but the tests for this disorder were negative; no history of excessive use of alcohol was obtained; no thought of pancreatitis or cirrhosis of the liver was entertained; and for all intents and purposes the insured was discharged from medical supervision, as completely cured, on November 8, 1965. The insured did not consult Dr. Weeks until January 17, 1966, and when he was hospitalized by Dr. Weeks on April 15, 1966, he was placed in Rocky Mount Sanitarium Hospital. For the purpose of this case, this was the significant hospitalization. Although Dr. Weeks was fully acquainted with the insured's medical history while he was under the care of Dr. Bell, there is not the faintest suggestion in the record either that Dr. Bell was aware of the insured's history under the care of Dr. Weeks, or that the Memorial Clinic Hospital had any records with regard to insured's later hospitalization in the Rocky Mount Sanitarium Hospital. I would conclude that inquiry of Dr. Bell and of Memorial Clinic Hospital would have disclosed little more than what was disclosed by the insured.

Overall, I would conclude that the insurer had no reason to inquire, or if it inquired, no reasonable prospect of obtaining the vital knowledge, so that it cannot be charged with knowledge of the insured's medical picture. Absent such knowledge or reason to obtain it, the doctrine of waiver is inapplicable. Jones v. Home Security Life Insurance Company, *supra*; Phoenix Mutual Life Insurance Co. v. Raddin, 120 U.S. 183, 7 S.Ct. 500, 30 L.Ed. 644 (1887).

Finally, the majority finds waiver in the insurer's delay in seeking to avoid

the policy. Bowles v. Mutual Ben. Health & Accident Ass'n., 99 F.2d 44, 50 (4 Cir. 1938), which is cited in support, makes clear that inaction while time passes constitutes waiver only when there is knowledge of the right to act coupled with the inaction. The insured died December 28, 1966, and the suit to avoid the policy was instituted September 25, 1967. The record is silent as to when proof of loss was submitted, what it contained, and, if it did not disclose the fraud, how and when the insurer became cognizant of it. Absent proof of these essential elements, the mere passage of nine months is without legal significance.