**SEFULUTASI SULUAI as beneficiary of SIPU SULUAI, Plaintiff,**

**v.**

**NATIONAL WESTERN LIFE INSURANCE COMPANY, Defendant.**

High Court of American Samoa
Trial Division

CA No. 134-00

May 10, 2002

Before KRUSE, Chief Justice, LOGOAI, Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Plaintiff, Paul F. Miller
 For Defendant, Roy J.D. Hall, Jr.

## OPINION AND ORDER

Sipu Suluai ("Sipu" or "decedent"), deceased, and his wife Sefulutasi Suluai ("Sefulutasi" or "plaintiff") applied for life insurance from the defendant National Western Life Insurance Co. ("NWL"), a corporation with headquarters in Texas. Sipu and Sefulutasi were initially interviewed on July 7, 1997, by NWL's American Samoa agent Afa Roberts ("Roberts"). Based on answers given by Sipu and Sefulutasi at these interviews, Roberts filled out an application form, a NWL standard form document, which sought, among other things, certain information on each applicant's medical history. This form required applicants to indicate whether they had been treated for any of a variety of illnesses over the previous five years. NWL delivered a policy on December 15, 1997, on Sipu's life designating plaintiff as the primary beneficiary. Plaintiff's application, on the other hand, was denied. Sipu died nine months after, on September 26, 1998, within the policy's "contestability clause" period of two years.

Testimony at trial and a series of letters and faxes exchanged between the parties illuminate how this case developed. On September 8, 1999, plaintiff filed a claim with NWL, enclosing copies of the decedent's death certificate and insurance policy, demanding the face amount of the policy, $50,000. On September 16, 1999, NWL wrote back requesting additional documents to process the claim, including copies of all medical records from July 1992 until the date of death. NWL pointed out that death had occurred within the contestable period. On October 14, 1999, plaintiff's counsel responded and advised, among other things, that he was attempting to locate the decedent's medical records, and that the documents would be forwarded immediately upon receipt. On October 26, 1999, NWL requested the decedent's medical records directly from LBJ Medical Center. On December 3, 1999, plaintiff's counsel wrote NWL that he had tried unsuccessfully to verify that the medical records were sent, and asked NWL if it had yet received the records. He then raised the suggestion that the records were unnecessary for NWL to process the claim because in his opinion the medical

problems admitted on the insurance application were the same problems resulting in the death of the decedent.

NWL's December 13, 1999, response indicates where the working relationship between the parties was clearly taking a turn for the worse. In this response, NWL mentioned that plaintiff's counsel had recently told one of NWL's staff members that the medical records were either lost or destroyed, but that LBJ had not confirmed this. NWL also informed plaintiff's counsel that it was plaintiff, and not the decedent, who had indicated she had diabetes at the time of the application. Once again, NWL then stated it needed the decedent's medical records before the claim could be further processed.

On March 29, 2000, NWL, citing a lack of communication from plaintiff, offered to refund the premiums paid on the policy. On April 10, plaintiff's counsel responded by citing Texas Insurance Code § 21.21 and asking for payment of the policy in full. No mention was made of the medical records. On April 12, NWL raised their position that the Texas Insurance Code requires an insurer to reject or accept a claim within fifteen business days after the date the insurer receives all forms and documents necessary to secure proof of loss—not simply within fifteen days of the filed claim. NWL also indicated that according to decedent's employer, he had been treated at LBJ prior to the issue date of the policy. Again, NWL requested that the medical records be provided if located.

## Discussion

It is NWL's theory that the decedent committed a misrepresentation by failing to notify NWL, at the time of application, of what should have been recognized as a major medical condition. Such a misrepresentation would absolve NWL of liability under the insurance contract. *See, e.g., Skinner v. Aetna Life and Cas.*, 804 F.2d 148, 149 (D.C. Cir. 1986).

### A. Misrepresentation

■ A "misrepresentation" in insurance is 1) a statement or representation by omission, made by the insured, that is untrue; 2) that is either made with the intent to deceive or made without knowing it to be true; 3) that misleads or has a tendency to mislead by causing reliance by the insurer; and 4) that is material to the risk insured. *See Mut. Life Ins. Co. v. Hilton-Green*, 241 U.S. 613, 621 (1916);*Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 282 (Tex. 1994); *Hollinger v. Mut. Ben. Life Ins. Co.*, 560 P.2d 824, 827 (Colo. 1977); 43 AM. JUR. 2D *Insurance* § 1011 (2000).

Roberts, agent of NWL who took decedent's and plaintiff's applications for life insurance and filled out their applications, testified before this court that he asked decedent whether he had any diseases or had been hospitalized in the five years preceding application. Roberts also testified that while he did not originally recall whether it was decedent or plaintiff who told him about having diabetes at that time, after reviewing the application it was his testimony that only the plaintiff admitted to having diabetes. This testimony is certainly more compelling than plaintiff's counsel's personal intimation while cross-examining Roberts that the latter had at a later date admitted knowledge of decedent's diabetes, a conversation Roberts did not recall. A review of the insurance application form itself shows that a box is checked indicating a history of illness, and in the "Details" section it is revealed that plaintiff had diabetes. Roberts' explanation of how the "Details" section would necessarily include any indication of decedent's condition, if mentioned, is obviously accurate and, accordingly, the form itself comports with Roberts' testimony. Additionally, when plaintiff's own insurance was rejected because of her diabetes, neither she nor decedent made any mention of the latter's diabetes to Roberts.

The insurance application itself was signed by decedent, and while the application clearly indicates that plaintiff suffered from diabetes it conspicuously makes no mention of decedent's condition. From this signed answer to the application's inquiries concerning health, we can conclude that decedent made the representation to NWL at the time of application that he did not knowingly suffer from any disease or illness at the time of application, and had not suffered from such for five years preceding application. *See, e.g., Phoenix Mut. Life Ins. Co. v. Raddin*, 120 U.S. 183, 189-90 (1886); *Prudential Ins. Co. v. Barden*, 424 F.2d 1006, 1010 (4th Cir. 1970); 43 AM. JUR. 2D *Insurance* § 1008 (2000) (where an answer of the applicant to a direct question purports to be a complete answer to the question, any substantial omission in the answer avoids a policy issued on the faith of the application). The signed insurance application indicating that only the plaintiff had diabetes, as well as the later rejection of plaintiff's, but not decedent's, insurance application because of her diabetes, clearly contradict plaintiff's unconvincing suggestion that the decedent told Roberts about his diabetes. No facts support this claim; in fact they all run counter to this testimony.

■ As evidence of decedent's knowing affliction with diabetes, NWL has provided evidence that the decedent was treated at the LBJ Medical Tropical Center during the time period relevant to the purposes of the insurance application. The testimony authenticating and commenting on the decedent's medical records was convincing, as were the records themselves. It is clear that the decedent was knowingly afflicted with

diabetes during the relevant time period, the five years preceding application for insurance. It is also clear from the extensive medical treatments decedent underwent that he was fully aware of his condition at the time of application. Decedent's representation of good health was, then, a misrepresentation.

■■■ An untrue statement in regard to a matter materially affecting the health of an applicant for life insurance, made by one who knows the statement is not true, allows the insurer to avoid the policy. *See* 43 AM. JUR. 2D *Insurance* § 1056 (2000) (the rule is "unanimous"). If a misrepresentation causes the insurer to assume a risk it otherwise would not have taken, or would not have taken at the rate of premium charged, there is a legal ground for avoidance. *See Bagwell v. Canal Ins. Co.*, 663 F.2d 710, 711 (6th Cir. 1981); *Allstate Ins. Co. v. Winnemore*, 413 F.2d 858, 861-62 (5th Cir. 1969); 43 AM. JUR. 2D *Insurance* § 1015 (2000). The testimony presented at trial, and logic, both show that the insured risk would change with knowledge of an applicant's diabetes. An altered risk would alter the chances of approval of the application, and certainly affect the premium rate if the application were granted. Accordingly, decedent's misrepresentation of his medical condition was a material misrepresentation, and justifies NWL's avoiding of the policy.

As far as reliance is concerned, it is quite clear from the testimony that NWL relies upon the representations concerning medical condition contained within their potential client's applications. If no conditions are indicated on the application, and the applicant signs the form, the company relies upon the applicant's representation of good health and issues the policy accordingly. Because decedent represented to NWL that he was in good health, and he knowingly was withholding information contrary to this representation, and this misrepresentation was material and relied upon by NWL, decedent committed a misrepresentation rendering the policy voidable by NWL, and NWL were thus justified in voiding the policy and denying plaintiff's claim.

2. Article 21.55 of the Texas Insurance Code

Plaintiff points to Article 21.55 of the Texas Insurance Code and its requirement that insurers accept or reject all claims within 15 business days of receiving all necessary items, statements, and forms required. We conclude that the Texas law does not apply to the situation at hand. There currently are two major approaches to conflict of laws in contract cases: the "significant relationship" rule, promulgated in the Restatement (Second) of Conflict of Laws, and the more traditional conflict-of-laws rules focusing on place of contracting and place of performance. *See, e.g.*, 16 AM. JUR. 2D *Conflict of Laws* § 86 (1998).

■ Under the significant relationship rule, the rights and duties of the parties are determined by the local law of the jurisdiction that has the most significant relationship to the transaction and the parties. *Id.*; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(1). In the case at hand, the contract was applied for and paid for in American Samoa. The contract claim was made in American Samoa. The insurer's agent is permanently located in American Samoa, as was the insured. The insured's health was a central issue in this case, and the insured was physically located, and his health was assessed, in American Samoa. The only relationship this case had to Texas was the location of insurer's headquarters. While the application was assessed at those headquarters, the decedent's misrepresentation, a central issue to this case, was made in American Samoa.

Under the more traditional place of contract and place of performance standards, the case for applying Territorial law is even stronger. As discussed, the contract was initiated, signed, and enforceable in American Samoa. The claim originated in American Samoa, and plaintiff sought to collect the payout of the claim in American Samoa. NWL was to insure Sipu's life, and Sipu lived in American Samoa, not Texas. The place of contract and place of performance was American Samoa. American Samoa law controls the rights and duties of the parties.

NWL argued that Texas law does not apply and, even if it did, until the medical records in question were produced, the 15 days cannot begin to toll. The Texas Insurance Code itself shores up NWL's argument, as § 21.55, Sec. 2(a) provides that investigation and acknowledgement of the claim must begin within the 15 days, it is not a requirement for payment or denial within that period of time. NWL produced extensive evidence that it was actively engaged in attempting to obtain the records necessary to assess plaintiff's claim, evidence which included correspondence with plaintiff's counsel, where plaintiff's counsel first appeared to be assisting in obtaining the documents and later claimed they were destroyed. Decedent's death was well within the period of contestability in which the NWL could contractually request medical information before paying a claim. Even if we found that Article 21.55 of the Texas Insurance Code applied, we would be compelled to conclude that NWL was not in violation of Texas law because of NWL's diligent efforts to obtain relevant information—clearly behavior antithetical to the sort of abuse that Texas law was intended to prevent.

For reasons given, judgment will enter for defendant NWL.

It is so ordered.